<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ANGELO OLLIE, | Case No.:  2:17-cv-04077 (PAZ) |
| Plaintiff, | **OPINION** |
| v. | |
| NANCY A. BERRYHILL,<br>Acting Commissioner<br>of Social Security, | |
| Defendant. | |

**APPEARANCES:**

JAMES LANGTON
LANGTON & ALTER, ESQS.
1600 ST. GEORGES AVENUE
PO BOX 1798
RAHWAY, NJ  07065
        On behalf of Plaintiff

SHAWN CHEREE CARVER
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 GARDEN SPRING STREET
PHILADELPHIA, PA  19123
        On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff Angelo Ollie for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (42 U.S.C. §§ 1381, et seq.).  Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying the application; Defendant, the Commissioner of Social Security ("the

Commissioner"), opposes Plaintiff's appeal.[1]  After careful consideration of the record, including

the ALJ hearing transcripts, the ALJ's decision, and the pleadings and memoranda of the parties,

the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and

Local Civil Rule 9.1(f).  For the reasons set forth below, the Court reverses the Commissioner's

decision that Plaintiff was not disabled and remands the case to the Commissioner for further

proceedings in accordance with the following instructions.

## I.    PROCEDURAL HISTORY

On May 22, 2013, Plaintiff filed an application for SSI alleging a disability onset date of

February 24, 2009.  (R. 193-98.)[2]  On September 11, 2013, the Commissioner determined that

Plaintiff was not disabled and denied the application.  (R. 71.)  Plaintiff filed for reconsideration,

and the application was again denied on March 13, 2014.  (R. 85.)  On October 29, 2015, an

Administrative Law Judge held a hearing on Plaintiff's application; Plaintiff was represented by

counsel at the hearing.  (R. 30-60.)  On December 28, 2015, the ALJ issued a decision denying

Plaintiff's application.  (R. 12-29.)  On April 13, 2017, the Appeals Council denied Plaintiff's

request for review (R. 1-5), thereby affirming the ALJ's decision as the "final" decision of the

Commissioner.  On June 6, 2017, Plaintiff timely filed this appeal pursuant to 42 U.S.C. §§ 405(g)

and 1383(c)(3).  ECF No. 1.  On May 1, 2018, Plaintiff consented to have a U.S. Magistrate Judge

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.  On March 6, 2018, the Government Accountability Office stated that, as of November 17, 2017, Ms. Berryhill's status violated the Federal Vacancies Reform Act, which limits the time a position can be filled by an acting official and "[t]herefore Ms. Berryhill was not authorized to continue serving using the title of Acting Commissioner[.]"  *Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1988 Commissioner*, Social Security Administration, Government Accountability Office (Mar. 6, 2018).  Ms. Berryhill continued to lead the Social Security Administration functionally from her position of record as Deputy Commissioner of Operations.  On April 17, 2018, Ms. Berryhill regained the title of Acting Commissioner.  *Patterson v. Berryhill*, No. 2:18-cv-00193-DWA, slip op. at 2 (W.D.Pa. June 14, 2018).

[2] "R." refers to the continuous pagination of the administrative record.  ECF No. 6.

conduct all further proceedings in the case to disposition pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  ECF No. 11.[3]  The case was reassigned to the undersigned Magistrate Judge on September 28, 2015.  ECF No. 15.

## II.    LEGAL STANDARD

### A.    <u>Standard of Review</u>

This Court has the authority to conduct a plenary review of legal issues decided by the ALJ in reviewing applications for Social Security disability benefits.  *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are supported by substantial evidence.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42 U.S.C. §§ 405(g) & 1383(c)(3).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).  Thus, substantial evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla.'"  *Bailey v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted); *see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be set aside merely because the Court "acting de novo might have reached a different conclusion." *Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986); *see*, *e.g.*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial

---

[3] Defendant has provided general consent to Magistrate Judge jurisdiction in cases seeking review of the Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project (D.N.J. Apr. 2, 2018).

evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.") (citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court ... is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "review the evidence in its totality" and "take into account whatever in the record fairly detracts from its weight." *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981) (substantial evidence exists only "in relationship to all the other evidence in the record"). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it "did not take into account the entire record or failed to resolve an evidentiary conflict." *Coleman*, 2016 WL 4212102 at *3 (citing *Schonewolf*, 972 F. Supp. at 284-85) (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978))).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the

4

record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4.  The Court "need[s] from the ALJ not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705-06; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, [s/]he must give some indication of the evidence which [s/]he rejects and [the] reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)).  "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482.  Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Id.* at 705.  As the Third Circuit explains:

> Unless the [ALJ] has analyzed all evidence and has sufficiently explained the weight [s/]he has given to obviously probative exhibits, to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776; *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984)).  Remand is also appropriate if the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted); *see*

*A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp.3d 512, 518 (D.N.J. 2016).  A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citation and quotation omitted); *see A.B.*, 166 F. Supp.3d at 518.  In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays.  *See*, *e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).  An award is "especially appropriate when "further administrative proceedings would simply prolong [Plaintiff's] waiting and delay his ultimate receipt of benefits."  *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

       **B.**     **<u>Standard for Awarding Benefits</u>**

Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for Social Security disability benefits based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. §§ 404.1505(a), 416.905(a).[4]  An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  Thus, an impairment can be established by objective medical evidence from an acceptable medical source, but cannot be established by a statement of symptoms, a

---

[4] Although the standards for disability are the same under Title II (42 U.S.C. §§ 401, et seq.) and Title XVI (42 U.S.C. §§ 1381, et seq.) of the Social Security Act, these are separate government programs subject different qualification requirements.

diagnosis, or a medical opinion.  *Id.* §§ 404.1521, 416.921.

The process for determining an adult's claim for Social Security disability benefits involves a five-step sequential inquiry.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a).[5]  The claimant bears the burden of proof at Steps One through Four.  At Step Five, the burden shifts to the Commissioner. *Id.* §§ 404.1512, 416.912; *see Holley v. Colvin*, 975 F. Supp.2d 467, 476-77 (D.N.J. 2013), *aff'd sub nom. Holley v. Comm'r of Soc. Sec.*, 590 F. App'x 167 (3d Cir. 2014).  At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step.  20 C.F.R. §§ 404.1523(c), 416.923(c).

At Step One, the ALJ decides whether the claimant is currently engaging in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Substantial gainful activity is work activity that involves doing significant physical or mental activities and is usually done for pay or profit.  *Id.* §§ 404.1572(a) & (b), 416.972(a) & (b).  If the claimant is engaging in such activity, then the inquiry ends because the claimant is not disabled.

"The [Step Two] inquiry is a de minimis screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003).  At this Step, the ALJ decides whether the claimant has a medically determinable impairment or a combination of such impairments that is severe.  20 C.F.R. §§ 404.1520(c), 416.920(c).  An impairment or combination of impairments is severe if it significantly limits a claimant's ability to perform basic work activities.  An impairment or combination of impairments is not severe if the claimant has a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional

---

[5] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. §§ 404.1527 and 416.927.

limitations.  *Id*. §§ 404.1522, 416.922.  If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "medically equals" the severity of an impairment(s) in the Listing of Impairments ("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.  If the claimant's specific impairment is not listed, the ALJ will consider the most closely analogous listed impairment for purposes of deciding medical equivalence.  *Id*. §§ 404.1526(b)(2), 416.926(b)(2).  If the claimant has an impairment or combination of impairments that meets or medically equals a Listing, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least 12 months.  *Id*. §§ 404.1509, 416.909.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC"), determine the physical and mental demands of the claimant's past relevant work, and determine whether claimant has the level of capability needed to perform past relevant work.  20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f).  RFC is the claimant's maximum remaining ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. Past relevant work is work performed (either as the claimant actually performed it or as it is generally performed in the national economy) either within the last 15 years or within 15 years prior to the disability date.  In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity.  *Id*. §§ 404.1560, 404.1565, 416.945, 416.960.  If the claimant's RFC enables her/him to perform past relevant work, then the claimant is not disabled.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(g), 416.920(g). If the claimant is incapable of doing so, then s/he is presumed to be disabled if her/his impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

In deciding the claimant's ability to perform other jobs that exist in significant numbers in the national economy, the ALJ must consider whether the claimant's impairment and symptoms result in exertional and/or non-exertional limitations. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. *Id*. §§ 404.1569a(a) & (b), 416.969a(b). Non-exertional limitations affect a claimant's ability to meet all other demands of a job (i.e., non-strength demands), including but not limited to difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. *Id*. at §§ 404.1569a(c), 416.969a(c).

If the claimant has no non-exertional limitations and can perform all or substantially all exertion demands at a given level, then the ALJ must use the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2. 20 C.F.R. §§ 404.1569a(b), 416.969a(b). The Grid Rules reflect various combinations of RFC, age, education, and work experience and direct a finding of disabled or not disabled for each combination. If the claimant also has any non-exertional limitations or cannot perform substantially all the exertional demands at a given level, then the Grid Rules are used as a framework for decision-making unless there is a rule that directs a conclusion of disabled without

considering the additional non-exertional or exertional limitations.   *Id*. §§ 404.1569a(d), 416.969a(d).   If the claimant has solely non-exertional limitations, then the Grid Rules provide a framework for decision-making.  *Id*. §§ 404.1569a(c), 416.969a(c).

## III.    ALJ DECISION AND APPELLATE ISSUES

In June 2007, Plaintiff applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.) at the age of 37.  He alleged disability due to obesity, sleep apnea, and affective disorder with an alleged onset date of August 19, 2005.  (R. 89, 99.)  In March 2011, an ALJ found that Plaintiff was not disabled, and in April 2013, the Appeals Council denied Plaintiff's request for review.  (R. 117-20.)  On May 22, 2013, Plaintiff filed an SSI application at the age of 43.  Although Plaintiff alleges an onset date of February 24, 2009, SSI is not retroactive prior to the application date.  Thus, the relevant period of review for purposes of this appeal begins on May 22, 2013.

At Step One of the decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 17.)  At Step Two, the ALJ found that Plaintiff had the following severe impairments:  obesity, obstructive sleep apnea, lumbosacral strain, and depression.  (R. 17.)  At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that were severe enough to meet or medically equal the severity of any Listing.  (R. 18-19.)  At Step Four, the ALJ found that Plaintiff had the RFC to perform sedentary work subject to various exertional and non-exertional limitations.  (R. 20-23.)  The ALJ further found at Step Four that Plaintiff was unable to perform past relevant work as a stocker. (R. 24.)  At Step Five, the ALJ found that a finding of not disabled would be directed by Grid Rule 201.21 if Plaintiff had the RFC to perform the full range of sedentary work.  The ALJ also found at Step Five that at least 3 jobs – document preparer, final assembler, and addresser – existed in

significant numbers in the national economy and could be performed by an individual with Plaintiff's age, education, work experience, and RFC. (R. 24-25.) The ALJ therefore concluded that Plaintiff was not disabled at any time since May 22, 2013. (R. 25.)

Plaintiff's attack on the ALJ's decision is twofold. First, Plaintiff contends that the ALJ erred at Step Three by failing to consider medical equivalence as to obesity, by itself or combined with other impairments. Second, Plaintiff contends that the ALJ erred at Step Four because the ALJ failed to include all of Plaintiff's credibly established limitations in the RFC finding.[6] Plaintiff asks the Court to reverse and remand for payment or, alternatively, for a new hearing. Defendant contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence.[7]

---

[6] Plaintiff additionally argues:

> The Commissioner did not carry her burden at step 5 because plaintiff's actual restrictions, as posed by the ALJ to the VE, were omitted from a decisional RFC which never combines the restrictions imposed by plaintiff's morbid obesity, obstructive sleep apnea, back impairment and depression (all acknowledged to be severe impairments at step 2). When even one such restriction is included, plaintiff is disabled as per the testimony of the Commissioner's vocational expert.

ECF No. 12 at 30 (citing R. 17). This argument simply restates Plaintiff's contention that the ALJ erred at Step Four in crafting the RFC finding. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 n.8 (3d Cir. 2005).

[7] The Local Rules require that a defendant's brief include an argument responding to plaintiff's argument. Local Civ. R. 9.1(e)(6). Defendant's 14-page brief does not acknowledge, let alone respond to, Plaintiff's argument that the ALJ erred at Step Three. *See* ECF No. 14 at 8-14. This omission hampers the Court's ability to understand and analyze the parties' arguments and is a failing that should not be repeated by counsel in future submissions to the Court.

IV.    **SUMMARY OF RELEVANT EVIDENCE**[8]

A.    <u>**Medical Evidence.**</u>

1.    **Treating Providers – Physical Impairments.**

In January 2013, Plaintiff was examined by Dr. Nahla Osman (family physician) as a follow-up for lower back pain.  Plaintiff weighed 336 pounds and was diagnosed as morbidly obese.  He complained about daily severe back pain, rated intermittently at 10 on a 10-point scale once daily for the previous 4 weeks.  Physical examination findings included paraspinal tenderness, but his musculoskeletal system was otherwise within normal limits.  Dr. Osman advised Plaintiff to exercise and lose weight; renewed Flexeril and Naproxen prescriptions; prescribed physical therapy for back pain; recommended that Plaintiff continue using his CPAP machine and follow-up with his pulmonary doctor; and recommended that Plaintiff continue with Wellbutrin XL and Abilify but follow-up with his psychologist.  (R. 395-96.)

In May 2013, Plaintiff returned to Dr. Osman.  Plaintiff's weight remained the same.  He was not experiencing back pain that day, and he reported that his back pain had improved since the last visit.  Plaintiff also reported that his CPAP machine had broken a few days earlier but that he had been "doing fine with it."  Physical examination findings were normal.  Dr. Osman noted that Plaintiff was non-compliant with physical therapy.  All prescriptions and recommendations were the same.  (R. 393-94.)

---

[8] The Local Rules require that a plaintiff's brief include a separate statement of facts with reference to the administrative record.  Local Civ. R. 9.1(e)(5).  Plaintiff's 30-page brief contains a 1-paragraph section entitled "Procedural History/Statement of Facts" that is devoid of any facts.  ECF No. 12 at 1-2.  The Local Rules also require that a defendant's brief include an argument responding to plaintiff's argument.  Local Civ. R. 9/1(e)(6).  This omission hampers the Court's ability to understand and analyze Plaintiff's argument and is a failing that should not be repeated by counsel in future submissions to the Court.

In August 2013, Plaintiff was examined by Dr. Vipin Garg (pulmonology/sleep medicine). Plaintiff weighed 313 pounds and stated that he had lost 27 pounds. He reported that his CPAP machine was less effective. Dr. Garg prescribed a sleep study. (R. 397-400.)

In September 2013, Plaintiff returned to Dr. Osman. Plaintiff weighed 345 pounds and was again diagnosed as morbidly obese. He denied any pain that day. He also stated that his CPAP machine was still broken and that he could not afford the sleep study prescribed by Dr. Garg. Physical examination findings were normal. Dr. Osman noted that Plaintiff was non-compliant with advice to lose weight. All prescriptions and recommendations were the same. (R. 391-92.)

In November 2013, Dr. Garg's office called Plaintiff to follow-up from August. Plaintiff stated that he had not yet done the sleep study because he could not afford to pay for it. He also stated that the CPAP machine helped because it stopped his snoring and made him feel refreshed during the daytime. (R. 407-09.)

In March 2015, Plaintiff was examined by Dr. Meeta Bhatt (neurology/sleep medicine). Dr. Bhatt noted that Plaintiff had been diagnosed with obstructive sleep apnea (OSA), selected positive airway pressure (PAP) therapy, underwent successful titration with continuous positive airway pressure (CPAP), and was currently prescribed BiPAP at 242 cms of water with Oxygen at 2 lit/min as treatment for OSA. Plaintiff denied any difficulty using his equipment and stated that he used it regularly on most nights for the entire sleep period. Plaintiff felt refreshed during the day, and he experienced improvement in daytime function, fatigue, and level of alertness. Dr. Bhatt was unable to access usage information on Plaintiff's compliance data card. Plaintiff's height and weight were recorded at 5'9" and 345 pounds, with a BMI of 51. His prescribed medications were Wellbutrin XL, Abilify, Vistaril, Naproxen, and Ritalin. Dr. Bhatt's physical

examination findings included:  obesity; normal mood and affect; and normal peripheral respiratory, cardiovascular, abdominal, vascular, neurologic, musculoskeletal, and lymphatic symptoms.  Dr. Bhatt diagnosed obesity and obstructive sleep apnea with hypersomnia.  He recommended that Plaintiff use the equipment when traveling and napping (although naps should be avoided); use caution while driving, using machinery, or performing any task requiring normal levels of wakefulness; undertake efforts to lose weight; and return for a follow-up in 4 months. (R. 439-42.)

In July 2015, Plaintiff returned to Dr. Bhatt and continued to report improvement.  Based on review of Plaintiff's compliance data card, Dr. Bhatt reported that Plaintiff used his equipment on 131 days during the period between March 1 and July 9 for an average daily use of 8.59 hours. Dr. Bhatt also reported that Plaintiff's current sleep schedule was to fall asleep within minutes of getting in bed at 10pm, awaken 4-5 times per night, and rise at 4:30-5am – with 1-2 hours naps during the day.  Plaintiff's height and weight were recorded at 5'9" and 374 pounds, with a BMI of 55.  Prescribed medications and physical examination findings were the same as the prior visit. Dr. Bhatt diagnosed obstructive sleep apnea with hypersomnia and recommended that Plaintiff return for a follow-up in 4 months.  (R. 435-38.)

### 2.    Treating Providers – Mental Impairment.

During the relevant period, Plaintiff was treated for his mental impairment at Trinitas Regional Medical Center through medication management, individual therapy, and group therapy. (R. 294-390, 410-23, 453-86.)  Notes for medication management appointments generally indicate that Plaintiff was stable, compliant with his prescriptions, and reported no adverse effects. Treatment notes from both individual and group therapy sessions note that Plaintiff was a voracious reader of self-help literature.

Plaintiff was seen on 23 occasions during 2013 for medication management and/or individual therapy. On February 12, April 30, and May 14, Plaintiff cancelled his appointments due to back pain. On January 22, Dr. Saul Gorman (psychiatrist) observed that Plaintiff had neutral mood and affect, linear thought process, and intact cognitive functioning. Dr. Gorman diagnosed mood disorder NOS. On March 19, Marc Schiffman (clinical social worker) reported that they had discussed "the divide between the patient's internal and very activity mental activity vs. the paucity of physical activity he demonstrates. … Patient was asked to explore what it would mean to do something (as little as walking every other day) regardless of being plagued by negative thoughts or feeling discomfort because his back hurts." On April 16, Plaintiff complained to Mr. Schiffman about severe sleep apnea. Mr. Schiffman noted: "The patient has had numerous sleep studies but has been unable to connect the results of the studies with the people responsible for calibrating the machine. Patient states that he has to either go to Old Bridge, NJ to have the machine addressed or pay $75 to have them come to his house and calibrate it. Patient spoke of the same low motivation that tends to interrupt his abilities to take care of tasks like these." He was instructed to get his CPAP calibrated "so his poor-sleep induced lethargy might be corrected." Plaintiff also participated in 7 group therapy sessions during 2013. He demonstrated positive attitude, appropriate affect, and attentive behavior in each session. On May 16, Plaintiff noted that he had "missed his last several appointments due to a sore back." On June 25, Plaintiff "shared about his difficulty overcoming his tiredness on a daily basis. Patient states that despite getting a new CPAP to address his sleep apnea he continues to waken through the night. Patient states that he is going to visit his pulmonologist later today to check into having machine re-calibrated. Patient allowed that despite feeling tired, he is able to do what he needs to do on a daily basis."

Plaintiff was seen on 7 occasions during 2014 for medication management and/or individual therapy. On July 23, Plaintiff told Dr. Ali Surahio (psychiatrist) that he was feeling okay but had trouble sleeping; he noted that he used a Bi-PAP machine for sleep apnea. She diagnosed mood disorder NOS. On September 17, Plaintiff told Dr. Surahio that he was sleeping okay at times and continued to use his CPAP. On November 5, Plaintiff told Dr. Surahio that he was attending the New Beginning Community Wellness Center from 2-7 pm on Sunday through Thursday. He enjoyed his time at a Halloween party there. On December 31, Plaintiff told Dr. Surahio that he continued to attend the New Beginning Community Wellness Center. Plaintiff also stated that he was waiting for a new CPAP machine. Plaintiff also participated in 3 group therapy sessions during 2014 and continued to demonstrate positive attitude, appropriate affect, and attentive behavior.

Plaintiff was seen on 4 occasions during 2015 for medication management and/or individual therapy. On February 25, Plaintiff told Dr. Surahio that he was sleeping okay at times but still waiting for a new CPAP machine. He also stated that, in March, he would begin a 9-month hotel management course at Career Academy. On July 17, Plaintiff was evaluated by Dr. Elaine Kwok (psychiatrist). She observed that Plaintiff was obese; well groomed; pleasant and cooperative; had loud speech volume and sporadic rambling speech that was re-directable; and demonstrated linear thought process, good mood, full and appropriate affect, and good cognitive functioning. He reported poor sleep due to sleep apnea, for which he used a CPAP machine. He also reported that his primary care physician, Dr. Luis Benalcazar, prescribed Tramadol for pain. Plaintiff denied any depressive symptoms. Dr. Kwok diagnosed mood disorder NOS R/o MDD R/o bipolar disorder. On October 22, Dr, Kwok observed that Plaintiff was obese; fairly groomed; calm and cooperative; had normal speech rate, volume, and tone; and demonstrated fair insight

and judgment, okay mood, appropriate affect, and fair cognitive functioning. Plaintiff again reported poor sleep due to sleep apnea but no depressive symptoms. Plaintiff also participated in 7 group therapy sessions during 2015. He continued to demonstrate positive attitude, appropriate affect, and attentive behavior, although he was "very verbal" during the March 20 session and "needed to be redirected at times."

### 3.    Consultative Examiners.

In August 2013, Dr. Allen S. Glushakow (orthopedic surgery) performed a consultative orthopedic examination. (R. 428-32.) Plaintiff stated that he last worked around February 2009; has been treated but never hospitalized for depression; has been treated for sleep apnea; has had back problems for several years; has been treated for back pain in the emergency room on several occasions; and received a Toradol injection in December 2012. Plaintiff's prescribed medications were Wellbutrin XL, Abilify, Vistaril, Flexeril, and Naproxen. Dr. Glushakow reported the following physical examination findings:

> He presented as a 5-foot-9-inch and 313-pound male who was in no acute distress. He was complaining of back pain. Examination of the neck revealed full range of motion. He had full range of motion in both shoulders, elbows, wrists and hands. Phalen's and Tinel's tests were negative. He had a full range of motion in the back. There was no spasm. He had a full range of motion in both hips, both knees, and both ankles. His gait was normal. Neurological revealed no focal findings.

(R. 428.) Dr. Glushakow also reported that x-rays of Plaintiff's lumbar spine showed good preservation of the disc spaces and no compression fractures. Dr. Glushakow's impressions were morbid obesity, lumbosacral strain, and history of depression. Dr. Glushakow also completed a Passive Range Of Motion Chart opining that Plaintiff had: normal range of motion in his shoulders, elbows, wrists, knees, hips, ankles, cervical spine, and lumbar spine; no sensory or reflex loss; no muscle weakness; negative bilateral straight leg raising test both supine and sitting; and no need for a hand-held assistive device.

In February 2014, Dr. Ernesto Perdomo (psychologist) performed a consultative psychological evaluation. (R. 424-27.) Plaintiff stated that he had depression, severe sleep apnea, chronic lower back pain, and high cholesterol; felt very sad and had mood swings; and did not want to get out of bed and slept at least 14-16 hours a day. Dr. Perdomo noted that Plaintiff had no history of psychiatric hospitalization but was in outpatient psychiatric treatment at Trinitas Hospital with Dr. Gorman, whom Plaintiff saw every other month for medication. Dr. Perdomo did not review Plaintiff's medical treatment records but noted that Plaintiff was morbidly obese at 5'9" tall and 350 pounds. Plaintiff's prescribed medications were Wellbutrin XL, Abilify, Vistaril, Flexeril, and Naproxen. Dr. Perdomo reported the following activities of daily living and functional capacity:

> [Plaintiff] spends his day at home, lying in bed, sleeping, or watching television. Some days, if he feels better, he goes to the library. He takes care of his personal need and hygiene, but only takes a shower 2 times a week. He has friends and socializes a little with them. He takes public transportation when needed. He is able to understand and follow instructions of moderate complexity like a 4-step instruction. He manages his money and pays his bills. He functions independently within the above limitations.

(R. 425.) Dr. Perdomo also reported the following mental status evaluation findings:

> [Plaintiff] was casually dressed and groomed. He was oriented to time, place, and person. His gait was normal, but he appeared morbidly and severely obese. Thought process was organized and focused. He spoke coherently and relevantly. There were no indications of any thought disorder or psychosis. He denied any hallucinations and no delusions were elicited. His affect was unremarkable, full, and appropriate for the evaluation session, but his mood was depressed and he reported feelings of sadness, tiredness, hypersomnia, mood swings, at times suicidal ideas and death wishes, no desire, no interest, no motivation, and withdrawal behaviors.
>
> Short-term memory was good. He was able to repeat 6 digits forward. He was able to repeat 4 digits backward. He was able to repeat 5 out of 5 words immediately after given to him.
>
> Long-term memory was good. He gave his background history with timeframe. He gave his social security number from memory. He stated that Mr. Obama is the

President and he named Mr. Bush, Mr. Clinton, Mr. Bush Sr., and Mr. Reagan in order as previous Presidents. He was able to recall 5 out of 5 words 5 minutes after given to him.

Concentration was also good. He followed the interview well. He was able to give a serial 3 and serial 7 (100-3 or 100-7 serially, he did it well without errors). He was able to follow 4-step instruction.

Intelligence is within the average range. Vocabulary is adequate. Association and abstraction abilities are fair. He associated an orange and a banana as being fruit; a dog and a lion, they are animals; a boat and a car, they have motors; and north and west as being directions.

(R. 425-26.) Dr. Perdomo diagnosed recurrent major depression, moderate to severe, without

psychotic features. He opined:

[Plaintiff's] main and dominant problems appeared to be medical, especially due to severe morbid obesity; severe sleep apnea; and chronic lower back pain. He also has recurrent minor depression that appeared to be moderate without psychotic features. His condition is such that it will affect his ability to function effectively.

(R. 426.)

### 4.    State Agency Reviewing Consultants.

In September 2013, State Agency reviewing consultants opined that:

- Plaintiff did not satisfy the paragraph A criteria for Listing 12.04 (Affective Disorders).

- Plaintiff did not satisfy the paragraph B criteria for Listing 12.04 because he had mild restrictions in activities of daily living; moderate difficulties in maintaining both social functioning and concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration.

- Plaintiff did not satisfy the paragraph C criteria for Listing 12.04.

- Plaintiff could: frequently lift/carry up to 20 pounds in an 8-hour day and occasionally lift/carry up to 25 pounds in an 8-hour day; stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour day; sit (with normal breaks) for a total of 6 hours in an 8-hour day; frequently balance and stoop; and occasionally kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, or scaffolds.

(R. 61-70.)  In March 2014, State Agency reviewing consultants concurred, except that:

- Plaintiff had mild (not moderate) difficulties in maintaining social functioning.

- Plaintiff was not significantly limited in the ability to:  carry out very short and simple instructions; carry out detailed instructions; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; make simple work-related decisions; be aware of normal hazards and take appropriate precautions; set realistic goals or make plans independently of others.

- Plaintiff was moderately limited in the ability to:  maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in the work setting; and travel in unfamiliar places or use public transportation.

(R. 72-84.)

       **B.**    <u>**Non-Medical Evidence.**</u>

In July 2013, Plaintiff submitted a Function Report.  (R. 268-75.)  He lived alone in an apartment, and his daily activities consisted of preparing meals, eating, walking to the library, and watching television.  He had no problems with personal care and did not need reminders to tend to his personal needs and grooming.  He also did not need reminders to take his medications.  He spent about an hour each day preparing meals like sandwiches, frozen dinners, spaghetti, and Hamburger Helper.  He was able to do laundry, which took him about 3 hours.  He would go to the store to shop for food, clothing, and other items, and this also took him 3 hours.  He did not say how often he did laundry or shopped.  He went outside every day and got around by walking or taking public transportation.  He did not drive a car because he did not have a driver's license. He was able to handle his finances.  About once a week he spent time with others talking and playing games.  It was difficult for him to sleep at night because of severe sleep apnea.  He had no problems getting along with others but felt that he has been more isolated since his impairments

began.  He also had more energy before his impairments and was in less pain.  He reported problems with the following:  lifting, squatting, bending, walking, sitting, memory, concentration, and understanding.  He could walk for 20 minutes before needing to stop and rest for 5 minutes. He did not follow written instructions well but followed spoken instructions decently; he sometimes finished what he started; and he got along well with authority figures.  He was never fired or laid off from a job because of problems getting along with other people.  He needed to take a nap when he was stressed, and he liked to stick a routine with no changes.

In October 2013, Plaintiff submitted an updated Function Report.  (R. 240-47.)  The Report was consistent with the previous Report except as follows.  He did not cook as much as he used to because back pain slowed him down.  Instead of going outside every day, he only went out a couple of times a week.  When he went out shopping, it was only for two hours instead of three hours.  In addition to doing laundry, he cleaned his apartment.  He also visited a community self-help center once a week.  He reported problems with the following:  lifting, squatting, walking, kneeling, and stair climbing.  He could walk for 10 minutes before needing to stop and rest for 5 minutes.  He could pay attention for 20 minutes and could not finish what he started.  He followed written and spoken instructions well.  He handled stress and changes in routine very well.  He explained that lumbar strain caused frequent back spasms throughout the day.  The condition had gotten worse in recent weeks; the pain was almost unbearable and at times he could barely walk.

In October 2015, Plaintiff testified during the hearing and was questioned by both his counsel and the ALJ.  (R. 34-53.)  The ALJ's decision summarized Plaintiff's testimony as follows:

> The claimant alleges that he is unable to work due to a combination of lower back pain and stiffness, and sluggishness.  He attributes the back pain and stiffness to lumbar strain that began while he did stock work from July 2008 through February 2009.  He attributes the sluggishness to difficulty sleeping as a result of sleep apnea and medications that he needs to take.  He states that he also struggles emotionally with issues that are painful to him.  Concerning his ability to perform work-related

activities, he testified he cannot lift more than 20 pounds at a time; that even lifting a gallon of milk with each hand might aggravate his back pain, hence he would avoid lifting more than one gallon at a time; that standing for ten to fifteen minutes could trigger back pain; that he can only walk one block slowly; that he has difficulty fitting into a chair and getting out of a chair; that he can sit for half an hour consecutively; that bending forward would be problematic; that he takes his time if he needs to lift something from the floor; and that he lacks the stamina to stay awake throughout an eight-hour workshift.

(R. 21.)  The Court notes that Plaintiff also testified that he weighed 380 pounds and had gained a lot of weight in recent years.  He attributed the weight gain to "maybe because of medication, maybe sleeping more, and probably not exercising maybe.  But my back prevents – the pain in my back prevents me from being a normal active person."  He was told by emergency room doctors in August 2015 that he should try to see a specialist because he had a lumbar strain.[9]  He first used a CPAP machine in the late 90s and has since had at least 3 sleep studies.  He was able to work until 2008 when he was let go from his job because he could not meet productivity requirements due to lack of sleep.  He needed to change sleep medicine doctors in 2014 because his insurance no longer covered Dr. Garg.   Before treatment with Dr. Bhatt, Plaintiff slept 2-3 hours each night. After beginning treatment with Dr. Bhatt, Plaintiff slept 1.5 hours each night.  He "can't sleep because the apnea is preventing me from going totally asleep, and then it's hard to time because I – I'm in bed, but I can't sleep because the obstructive sleep apnea."  He feels better when he gets up in the morning but is fatigued by the afternoon and needs to take several naps to compensate for not getting sleep at night.[10]

---

[9] There is no evidence in the record that Plaintiff sought treatment for back pain in 2014 or 2015.

[10] There is no medical evidence in the record regarding Plaintiff's obstructive sleep apnea between November 2013 (when Plaintiff was still seeing Dr. Gang) and March 2015 (when Plaintiff was already seeing Dr. Bhatt).

## V.    DISCUSSION

### A.    Step Three.

At Step Three, the ALJ found that "the record does not establish that any listing is met; nor

does it suggest that medical equivalence is likely enough to warrant consulting another medical or

mental health expert."  (R. 18 (explaining that "[i]n making these determinations, the claimant's

established medical impairments have been compared to the most similar listings.").)  As explained

by the ALJ:

> There is no listing specifically for obesity.  The effects of the obesity on other
> impairments are considered under the listings for the affected impairments,
> consistent with Social Security Ruling 02-1p.
>
> I have also considered listing 3.10 (sleep-related breathing disorders).  However,
> there is no evidence in the record of chronic cor pulmonale.  There is also no
> objective evidence, or any diagnosis, of organic mental disorder.  Even assuming
> that the obstructive sleep apnea has interfered with the claimant's subjective
> cognitive function, the criteria of listing 12.02 are not satisfied, as discussed
> concerning the mental impairment listings.
>
> Attention has been given to Listing 1.04 (disorders of the spine).  However, in the
> relevant past there has not been any abnormal imaging study of the spine, [] let
> alone any imaging study reflecting compromise of a nerve root or the spinal cord.
> There has not been any relevant operation in the spine area.  Moreover, the
> lumbosacral strain has not been characterized by limitation of motion of the spine,
> positive straight leg raising, sensory or reflex loss, or motor loss in a radicular
> distribution characteristic for nerve root compromise.
>
> The severity of the claimant's mental impairment and/or any adverse effect of
> disordered breathing during sleep on the functioning of the claimant's brain does
> not meet or medically equal the criteria of listings 12.02 [organic mental disorder]
> or 12.04 [affective disorders].

(R. 18-19.)[11]   The ALJ found that Plaintiff did not satisfy the identical paragraph B criteria of

Listings 12.02 and 12.04 because he had moderate limitations in each (1) activities of daily living,

_____

[11] The Court analyzes all Listing criteria, as did the ALJ, as of December 31, 2015, the date of the ALJ's
decision.  The applicable criteria are described in:  Social Security Administration Program Operations
Manual System ("POMS") DI 34121.011, *Musculoskeletal Listings from 06/16/2008 to 09/28/2016*,

(2) social functioning, and (3) concentration, persistence, or pace; and because he had experienced no episodes of decompensation that were of extended duration. The ALJ found that Plaintiff did not satisfy the identical paragraph C criteria of Listings 12.02 and 12.04 because the record did not show either that his adjustment was so marginal that he would be predicted to decompensate upon minimal increase in mental demands or changes in the environment, or that he had been unable to function outside a highly supportive living arrangement. (R. 20.)[12] Plaintiff argues that the ALJ committed reversible error by failing to consider whether Plaintiff's obesity (individually) or a combination of Plaintiff's impairments (including obesity) was medically equivalent to any Listing. The Court disagrees.

Social Security Ruling 02-1p provides explicit instruction for considering obesity at Step Three. The ALJ must determine whether the claimant's obesity by itself is *medically equivalent* to any Listing. For example:

> [I]f the obesity is of such a level that it results in an inability to ambulate effectively, as defined in sections 1.00B2b or 101.00B2b of the listings, it may substitute for the major dysfunction of a joint(s) due to any cause (and its associated criteria), with the involvement of one major peripheral weight-bearing joint in listings 1.02A or 101.02A, and we will then make a finding of medical equivalence.

*Id.*, *Titles II & XVI: Evaluation of Obesity*, 2000 WL 628049, at *5 (S.S.A. Sep. 12, 2002)).[13] The

---

available at http://policy.ssa.gov/poms.nsf/lnx/0434121011; POMS DI 34123.009, *Respiratory Listings from 04/13/06 to 10/06/16*, available at http://policy.ssa.gov/poms.nsf/lnx/0434123009; and POMS DI 34132.009, *Mental Listings from 12/18/07 to 09/28/16*, available at http://policy.ssa.gov/poms.nsf/lnx/0434132009.

[12] Although Listings 12.02 and 12.04 have different paragraph A criteria (*see* POMS DI 34132.009), it was not necessary for the ALJ to discuss paragraph A after finding that Plaintiff did not satisfy the criteria of paragraphs B or C. *See Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 813-14 (3d Cir. 2016); *Nunez v. Comm'r of Soc. Sec.*, No. 2:14-cv-4664 (KM), 2015 WL 4770991, at *4 (D.N.J. Aug. 12, 2015).

[13] Under Listing 1.00 B2b, "[i]neffective ambulation is defined generally as having insufficient lower extremity functioning (*see* 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." POMS DI 34121.011. Listing 1.00J requires an examination of the claimant's ability to ambulate without the device(s) in place. *See id*. The Court observes that there is no record evidence that Plaintiff was prescribed or otherwise used such a device.

ALJ must also determine whether obesity in combination with any of the claimant's other impairments *meets* any Listing. "This is especially true of musculoskeletal, respiratory, and cardiovascular impairments. It may also be true for other coexisting or related impairments, including mental disorders." *Id*. For example, Listing 12.05C (Intellectual Disability) can be satisfied by "[a] valid verbal, performance, or full scale IQ of 60 through 70 *and* a physical or other mental impairment imposing an additional and significant work-related limitation of function" (POMS DI 341123.009 (emphasis added)) – and obesity satisfies the physical impairment criterion of this Listing (SSR 02-1p, 2000 WL 628049, at *5). The ALJ must further determine whether any combination of impairments (including obesity) is medically equivalent to any Listing. For example:

> [O]besity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected. Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.
>
> However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

SSR 02-1p, 2000 WL 628049, at *5.

The ALJ's Step Three discussion did not refer to any record evidence relating to Plaintiff's obesity. Nor did the ALJ explain how he considered Plaintiff's obesity as to Listings 1.04, 3.10, 12.02, 12.04, or any other Listing. These omissions are problematic in two respects. First, the Court cannot confirm that the ALJ applied the proper analytical framework. The ALJ's

observation that "[t]he effects of the obesity on other impairments are considered under the listings for the affected impairments, consistent with Social Security Ruling 02-1p" offers no assurance that the ALJ understood the Ruling's three-pronged instruction.  (R. 18)  Second, even if the ALJ applied that instruction, the Court could not meaningfully review his analysis.  There is no explanation for the ALJ's finding that Plaintiff's obesity by itself was not medically equivalent to any Listing; that Plaintiff's obesity in combination with his obstructive sleep apnea, lumbosacral strain, and depression did not meet any Listing; or that Plaintiff's combined impairments were not medically equivalent to any Listing.  The Court therefore finds that the ALJ erred at Step Three as to Plaintiff's obesity.  *See Gullace v. Colvin*, No. 15-cv-7630 (FLW), 2017 WL 714356, at *9 (D.N.J. Feb. 23, 2017) (ALJ erred by "not adequately explain[ing] his consideration of Plaintiff's obesity in connection with the step three analysis").

Plaintiff bears the burden on appeal of showing not merely that the ALJ erred, but also that the error was harmful.  *See Woodson v. Comm'r of Soc. Sec.*, 661 F. App'x 762, 766 (3d Cir. 2016) (citing *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)); *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005) ("[A] remand is not required here because it would not affect the outcome of the case.").  The Third Circuit instructs that "that the attacking party must 'explain[ ] how, even if the ALJ's analysis was lacking, the deficiency was harmful to his claims,' including 'affirmatively point[ing] to specific evidence that demonstrates he should succeed[.]'"  *Gullace*, 2017 WL 714356, at *10 (quoting *Woodson*, 661 F. App'x at 766).  At Step Three, this requires an explanation of "how the ALJ's lack of meaningful consideration as to Plaintiff's obesity would change any of the ALJ's analysis."  *Id.*

Plaintiff first asserts that his obesity is "presumptively disabling all by itself" because in September 2015, his weight and BMI were, respectively, 65 pounds and 15 points above the

amounts considered presumptively disabling under rescinded Listing 9.09.  ECF No. 12 at 23; *see id*. at 10 n.2, 13, 16-17.  But Social Security Ruling 02-1p explains that Listing 9.09 (Obesity) was rescinded because its criteria "were not appropriate indicators of listing-level severity."  SSR 02-1p, 2000 WL 628049, at *1.  As explained above, the Ruling provides that obesity by itself still can be found disabling *if* the obesity is medically equivalent to an existing Listing.  Plaintiff offers no such argument.  *Cf. Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 93 (3d Cir. 2007) (rejecting claimant's reliance on Listing 9.09 in arguing that ALJ failed to consider obesity at Step Three where Listing was rescinded before disability claim was filed).

> Plaintiff next quotes from the preamble to all Respiratory Listings:
>
> Obesity is a medically determinable impairment that is often associated with disturbance of the respiratory system, and disturbance of this system can be a major cause of disability in individuals with obesity.  The combined effects of obesity with respiratory impairments can be greater than the effects of each of the impairments considered separately.  Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

ECF No. 12 at 22-23 (citing Listing 3.00I (Effects of Obesity), POMS DI 34123.009).  However, Plaintiff fails to explain *why* the additional and cumulative effects of his obesity, combined with his other impairments, meets or is medically equivalent to Listing 3.10 (Sleep-Related Breathing Disorders).  Listing 3.10 is evaluated under Listing 3.09 (Chronic Cor Pulmonale) *or* Listing 12.02 (Organic Mental Disorders).  Listing 3.09 requires "establishment of an impairment attributable to irreversible cor pulmonale secondary to chronic pulmonary hypertension" documented "by signs and laboratory findings of right ventricular overload or failure," *and* mean pulmonary artery pressure greater than 40 mm HG *or* arterial hypoxemia (evaluated pursuant to prescribed arterial blood gas value Tables).  *See* POMS DI 34123.009.  Plaintiff points to no record evidence with

even tangential relevance to the Listing 3.09 criteria.  Listing 12.02 requires satisfaction of *both* the paragraph A and paragraph B criteria, *or only* the paragraph C criteria.  *See* POMS DI 34132.009.  The paragraph A criteria are loss of specific cognitive abilities *or* affective changes, *and* the medically documented persistence of at least one of the following:  (1) disorientation to time and place; (2) memory impairment, either short-term, intermediate, or long-term; (3) perceptual or thinking disturbances; (4) change in personality; (5) disturbance in mood; (6) emotional lability and impairment in impulse control; *or* (7) loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing.  Plaintiff does not cite paragraphs A and C of Listing 12.02, let alone any supporting record evidence.  Plaintiff's only citation to paragraph B appears in a footnoted ad hominem attack on the ALJ's analysis of Plaintiff's mental impairment and obstructive sleep apnea, each considered individually.  ECF No. 12 at 24 n.9.[14]

The Court therefore finds that remand is not warranted at Step Three because the ALJ's error as to Plaintiff's obesity was harmless.  *See*, *e.g.*, *Woodson*, 661 F. App'x at 766 (affirming Step Three finding where claimant "only says in very vague terms that an actual discussion of his impairments would lead to the conclusion that he was disabled at step three") (citations omitted); *Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 814 (3d Cir. 2016) (no basis for remanding case even if Step Three analysis were deficient where claimant complained "in vague terms that

---

[14] Plaintiff argues that the ALJ's paragraph B analysis was "incomplete" because the ALJ "merely labeled all of plaintiff's restriction[s] as 'moderate' on subjective or anecdotal criteria … based on a desire[d] outcome rather than a neutral appraisal of plaintiff's cognitive abilities."  ECF No. 12 at 24 n.9.  The Court need not decide whether this cursory treatment constitutes a waiver.  First, the Court finds that "the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [claimant] did not meet the requirements for [paragraph B]."  *Jones*, 364 F.3d at 505.  (R. 19-20, 22-23.)  Second, Plaintiff fails to identify substantial evidence that would support a marked limitation in at least two functional categories or that he experienced a marked limitation in one functional category together with repeated episodes of decompensation, each of extended duration.

certain impairments were not properly compared, separately and in combination, to the listings" without identifying "specific avenues for meeting or equaling specific listings that the ALJ should have considered but did not"); *Cosby v. Comm'r of Soc. Sec.*, 231 F. App'x 140, 146 (3d Cir. 2007) (affirming Step Three finding where Plaintiff "does not point to any medical evidence ignored by the ALJ that would show that [claimant's] impairments medically equaled one of the listings"); *Milano v. Comm'r of Soc. Sec.*, 152 F. App'x 166, 169 (3d Cir. 2005) (affirming Step Three finding where claimant "has not attempted to show that her impairments meet or equal any specific Listing, and merely concludes that she has 'severe medical conditions' that 'might' do so") (internal citation omitted)).

### B.    Step Four – RFC Finding.

At Step Four, the ALJ found that Plaintiff had the residual functional capacity to perform sedentary work as defined in 20 CFR §416.967(a) except:

> He cannot climb; he can only perform other postural functions occasionally; he must avoid dangerous machinery and unprotected heights; he must avoid concentrated exposure to dust, fumes and similar occupational irritants; he can only understand, remember and carry out simple instructions; he can only have incidental interaction with the general public and occasional interaction with coworkers and supervisors; and he can handle changes to essential job functions on an occasional basis.

(R. 20.)  Plaintiff contends that the ALJ committed reversible error because the limitations in the RFC finding are not based on substantial evidence, and the RFC finding does not include all of Plaintiff's credibly established limitations.  Although the Court disagrees with nearly all of Plaintiff's arguments, the Court agrees that remand is warranted.

       1.        **RFC Limitations.**

Plaintiff argues that the RFC is "based on an essential baseline assumption – never explained or defended – that plaintiff could: (1) perform sedentary work[;] (2) understand, remember and carry out simple instructions[;] (3) tolerate occasional interaction with coworkers and supervisors but not the general public[; and] (4) avoid concentrated exposure to pulmonary irritants."  ECF No. 12 at 28.

As to limitation (1), the ALJ stated that "[t]he combination of the adverse effect of obesity on mobility, chronic back pain from the obesity/lumbosacral strain, as well as fatigue from the sleep apnea, mood disorder, muscle relaxant medication that has been prescribed at times for back pain and/or sedative medication prescribed for the mood disorder" would not prevent Plaintiff from "standing/walking (with normal breaks) for a total of about two hours per 8-hour workday, [and] sitting (with normal breaks) for a total of about six hours per 8-hour workday[.]"  (R. 21-22.)  Social Security Ruling 96-9p instructs that "[i]n order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals."  SSR 96-9p, *Titles II & XVI:  Determining Capability To Do Other Work—Implications Of A Residual Functional Capacity For Less Than A Full Range of Sedentary Work*, 1996 WL 374185, at *6 (S.S.A. Jul 2, 1996).  As the ALJ correctly noted, "there are no purely objective findings related to the lumbosacral strain."  (R. 22.)  The record reflects that Plaintiff sought medical treatment for back pain on two occasions during the relevant period – in January and May 2013, by which time Plaintiff reported that his pain had subsided.  There is no evidence, other than Plaintiff's self-reports, that he was prescribed pain medication after May 2013.  Dr. Glushakow reported that Plaintiff's lumbar spine x-rays revealed no abnormalities; Plaintiff had

normal range of motion in all areas; and bilateral straight leg raising tests were negative in both supine and sitting positions. No treating provider or consultative examiner opined that Plaintiff would not be able to perform sedentary work. The Court therefore finds that the ALJ sufficiently explained his reasoning for including limitation (1) and that this limitation is supported by substantial evidence.

Moreover, the Court finds that any error regarding limitation (1) would be harmless. Plaintiff points to no conflicting evidence overlooked by the ALJ. Plaintiff instead asserts that the ALJ did not properly consider Plaintiff's obesity in combination with his back impairment at Step Four. *See* ECF No. 12 at 11 ("Additionally, obesity as not combined with plaintiff's severe back condition in a decisional RFC which concludes that plaintiff could sit 6-8 hours comfortably while meeting the production needs of sedentary work."); *id*. at 28 ("We don't know why plaintiff's damaged back supporting his massive frame could tolerate 6-8 hours of seating. We don't know why because the decision doesn't tell us why.") Advancing this argument by itself fails to meet Plaintiff's burden of demonstrating that the ALJ would have inevitably come to a different outcome had he considered Plaintiff's obesity. *Woodson*, 661 F. App'x at 766. As Judge Wolfson recently explained in rejecting a similar argument asserted by Plaintiff's counsel in a different case: "Because Plaintiff has merely offered a generalized response that his weight makes it harder for him to stand and walk, he has failed to meet his burden, and as such, this Court finds the ALJ's error to be harmless." *Gullace*, 2017 WL 714536, at *10 (citations omitted). The argument fares no better in this case, where Plaintiff has merely offered a generalized response that his weight makes it harder for him to sit.

As to limitations (2) through (4), the ALJ explained:

Considering the combination of the depressive thoughts, pain and fatigue, the claimant only can understand, remember and carry out simple instructions.

> Furthermore, the frequent depressive thoughts do warrant finding that the claimant only can have incidental interaction with the general public, only can interact appropriately with coworkers and supervisors on an occasional basis, and cannot handle changes to essential job functions on an occasional basis."

(R. 22-23.)  The ALJ noted that these limitations were consistent with his Step Three findings, and the State Agency reviewing consultants' opinions, that Plaintiff was moderately limited in social functioning and concentration, persistence, and pace.  (R. 23 ("at the reconsideration level the consultant concluded that the claimant could sustain focus, memory, social interaction and pace/persistence for simple, routine tasks").)  The ALJ also explained that "given the difficulty breathing at night, the claimant would need to avoid irritating his respiratory tract by exposure to dust, fumes and similar occupational irritants."  (R. 22.)  The Court finds that the ALJ sufficiently explained his reasoning for including limitations (2) through (4) and that these limitations are supported by substantial evidence.

Moreover, the Court finds that any error regarding limitations (2) through (4) would be harmless.  Plaintiff complains that limitation (2) is "[a]dministrative-speak for all unskilled work" (ECF No. 12 at 28 n.10) but offers no evidence that it was unfounded.  Plaintiff complains as to limitation (3):

> In order to perform any work activity, the DOT insists that a worker "occasionally" (very little to 1/3 of the workday) interact with coworkers and supervisors. Virtually every factory or warehouse job is free from interaction with the public. The Court might wonder why plaintiff can't interact with anyone but those whom he meets at work.  The decision certainly doesn't tell us.

*Id*. at 28 n.12.  Plaintiff points to no evidence that would support less than occasional interaction with coworkers and supervisors.  This is not surprising, as the ALJ reasonably might not have limited Plaintiff's interaction with anyone.  Indeed, no such limitations were opined by any treating providers, consultative examiner, or State Agency reviewing consultant.  Plaintiff complains that limitation (4) "is the conventional knee-jerk limitation in the presence of pulmonary impairments"

that "has no real-world vocational effect" and no effect on Plaintiff's obstructive sleep apnea. *Id.* at 28 n.13. To the extent the lay understanding of Plaintiff's counsel is accurate, including the limitation *helped* Plaintiff because it foreclosed the VE's consideration of a broader universe of jobs.

### 2. Other Credibly Established Limitations.

Plaintiff argues that "[t]he Commissioner did not carry her burden at step 5 because plaintiff's actual restrictions, as posed by the ALJ to the VE, were omitted from a decisional RFC which never combines the restrictions imposed by plaintiff's morbid obesity, obstructive sleep apnea, back impairment and depression (all acknowledged to be severe impairments at step 2)." ECF No. 12 at 30. But the alleged errors about which Plaintiff complains – namely, the failure to include additional limitations in the RFC finding – involve Step Four, where the burden of proof rests with Plaintiff. Plaintiff cites no legal authority requiring the ALJ to explain why the VE was questioned about limitations that were ultimately excluded from the RFC finding. *See McGhee v. Comm'r of Soc. Sec.*, No. 08-cv-594 (FLW), 2014 WL 2618541, at *9 (D.N.J. Jun. 12, 2014) (citing *Wallace v. Secretary of Health & Human Services*, 722 F.2d 1150, 1153 (3d Cir. 1983)).

Plaintiff argues that the ALJ erroneously failed to include the following limitations in the RFC finding: (1) Plaintiff when sitting requires a special size chair that could accommodate his frame; (2) Plaintiff when sitting must be able to lean backwards with his weight against the back of the chair; (3) Plaintiff could perform a maximum of 6 hours in a normal 8-hour workday and thus would be off-task for some of the day; and (4) Plaintiff would require a minimum of 2 absences per month. Plaintiff correctly recites the VE's testimony that inclusion of any one of these limitations in the decisional RFC finding would preclude Plaintiff from full-time work.

33

Limitations (1) and (2) did not appear in the record until Plaintiff was questioned by his counsel during the hearing. (R. 47-48.) Plaintiff never complained in his Function Reports, to his treating providers, or to the consultative examiners that he required a special chair because of his size or was limited to a specific seated position because of his back impairment. The ALJ rejected Plaintiff's testimony that he would have problems fitting into and getting out of a standard chair because Plaintiff also testified that he traveled by public transportation and sat on the bus with no problems. (R. 52.) Although the ALJ's decision did not expressly address Plaintiff's testimony that he must sit in a specific position, the ALJ correctly stated "[t]hat there are no purely objective findings related to the lumbosacral strain." (R. 22.) As discussed above, the only evidence of any treatment for back pain during the relevant period was in January and May 2013, by which time Plaintiff reported that his pain had subsided. As also discussed above, Dr. Glushakow reported that Plaintiff's lumbar spine x-rays revealed no abnormalities; that Plaintiff had normal range of motion in all areas; and bilateral straight leg raising tests were negative in both supine and sitting positions. No treating provider or consultative examiner opined that Plaintiff required a special chair or was limited to a specific seated position. The Court therefore finds that remand is not warranted because substantial evidence supports the exclusion of limitations (1) and (2) from the RFC finding.[15]

---

[15] Plaintiff's reliance on *Poulos v. Commissioner of Social Security*, 474 F.3d 88 (3d Cir. 2007), is misplaced. *See* ECF No. 12 at 22-23. In that case, the claimant weighed 500 pounds, had a BMI of 81, and alleged both that his weight caused him to break chairs when was sitting in them and that he did not fit into certain cars. *Poulos*, 474 F.3d at 90-91. The ALJ found that Plaintiff was limited to chairs that were designed to support his weight but summarily concluded this limitation "would not significantly erode the sedentary occupational base since sturdy chairs are typically readily available in settings where sedentary work is done." *Id*. at 94. The Third Circuit remanded the case to the Commissioner because the ALJ erroneously relied on his own lay opinion – instead of VE testimony – about whether such chairs were a special accommodation or readily available. By contrast, the issue in this case is whether, in the first instance, Plaintiff's obesity limits him to special chairs.

As to limitations (3) and (4) – that Plaintiff would be off-task during the workday and require at least 2 absences each month – Plaintiff complains that the "[t]here is no mention of plaintiff's daytime somnolence, the chief residual of sleep apnea and a complaint voiced by the plaintiff at the hearing and throughout the record." ECF No. 12 at 11. This is an unfair criticism of the ALJ's decision, which explained:

> Furthermore, the allegation of lack of stamina to stay awake throughout an eight-hour work shift is grossly disproportionate to the clinical findings and inconsistent with the claimant's pursuit of treatment and with some of the claimant's routine activities. … While the BMIs have exceeded 45 with the possible exception of the month of August 2013, when the claimant briefly lost some weight, and have even exceeded 55 recently, the claimant rejected the suggestion of bariatric surgery. The claimant has generally reported benefit from CPAP/BiPAP. The claimant's cognitive functioning has, with extremely rare exception, been at least fair clinically. Often it has been intact. The claimant has been attentive to the process and participated actively in group therapy. At the mental consultative examination, he spoke coherently and relevantly, and even demonstrated good memory and concentration. Furthermore, he acknowledges that he manages to sustain basic activities of daily living independently, to travel by public transportation unaccompanied, to manage his funds and pay his bills, and to do a lot of reading.

(R. 22; *see id.* at 23.) Nevertheless, the Court cannot meaningfully review whether substantial evidence supports exclusion of limitations (3) and (4) from the RFC finding. As alluded by the ALJ, Plaintiff reported in March and July 2015 that he used his CPAP machine on most nights for the entire sleep period time; felt refreshed during the day; and experienced improvement in daytime function, fatigue, and level of alertness. Plaintiff was questioned during the October 2015 hearing about the apparent discrepancy between the improvements reported to Dr. Bhatt and Plaintiff's testimony that slept fewer hours per night (1.5 hours) than before he began treatment with Dr. Bhatt (2-3 hours). Plaintiff responded that he usually could fall asleep but frequently woke up during the night and could not fall back asleep; as a result, he required naps during the day. The ALJ's decision did not mention Dr. Bhatt's recommendation in March 2015 – notwithstanding Plaintiff's reported improvement – that Plaintiff use caution while driving, using machinery, or

performing any task requiring normal levels of wakefulness. The Court is especially troubled that the ALJ provided no insight into whether – and if so, how – the ALJ analyzed Dr. Bhatt's recommendation. As Social Security Ruling 02-1p instructs when considering obesity at Step Four:

> The effects of obesity may not be obvious. For example, some people with obesity also have sleep apnea. This can lead to drowsiness and lack of mental clarity during the day. … As explained in SSR 96-8p ("Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims"), our RFC assessments must consider an individual's maximum ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea.

SSR 02-1p, 2000 WL 628049, at *6. The Court notes in this regard that the ALJ did not mention the compliance data card information reflected in Dr. Bhatt's July 2015 treatment notes, which denote 8.59 hours of average daily equipment usage with no differentiation among time spent trying to fall asleep, overnight sleep, and daytime naps. The Court therefore finds that remand is warranted for consideration of limitations (3) and (4) as to the RFC finding, including any further development of the record as may be necessary.

### C.    State Agency Reviewing Consultant Opinions.

Finally, the Court addresses Plaintiff discussion – spread over four pages in the "Summary of Argument" section of his brief and never referenced again – of the "ever-shifting evidentiary attitude in the decision with regard to the probative value owed to the opinions of the Commissioner's file-reviewing doctors subcontracted from the Division of Disability Determination ('DDS')." ECF No. 12 at 13.

At Step Three, the ALJ stated that "DDS medical and mental health experts who reviewed the evidence that was obtained in connection with the initial and reconsideration adjudications of

the instant claim concluded that the claimant did not have any listing level impairment." (R. 18.) Plaintiff posits that this statement is "humorous" because "[n]o administrative law judge has ever seen, much less adjudicated, any Social Security Disability appeal in which DDS physicians concluded that the applicant's impairments were the medical equivalent of the Commissioner's listings. In such cases, disability is awarded at the lower levels of adjudication, rendering an appeal to an ALJ both impossible and ridiculous." ECF No. 12 at 13 n.6. At Step Four, the ALJ stated:

> DDS medical consultants who participated in prior adjudications of the instant claim actually assessed less physical restrictions in several respects than the ones incorporated in the residual functional capacity found in this decision. However, these opinions are given limited weight. Notwithstanding the consultants' medical expertise, disability program knowledge and apparent neutrality, the consultants did not personally examine the claimant. Moreover, the written rationale does not reflect consideration of the sleep apnea, of the claimant's weight in months other than the month in which the consultative orthopedic examination took place, or of the combinations of medically determinable impairments and medications that could cause subjective physical limitations. …

> DDS mental health consultants who reviewed the file in connection with the prior adjudications assessed, overall, moderate mental limitation. Although no mental residual functional capacity from the initial level can be located, at the reconsideration level the consultant concluded that the claimant could sustain focus, memory, social interaction and pace/persistence for simple, routine tasks. Significant weight is due those opinions. The consultants are mental health experts and are also experts about the mental health issues involved in adjudicating claims of disability under the Act. They have no apparent biases. Additionally, their written rationales note the presence of one or more affective disorders and the mental stability reflected in the treatment records. To the extent that their assessments are less restrictive than the ones in this decision, they are assigned relatively little weight because the written rationales are scant and do not show that adverse effects of the claimant's physical symptoms on his mental functioning were considered.

(R. 22-23.) Plaintiff asserts that the ALJ's assessment of the State Agency reviewing consultants' opinions is a "murky morass of contradictions" that makes judicial review "utterly impossible:"

> To review, the combination of plaintiff's impairments don't meet the listings because "in fact" even "DDS medical and mental health experts who reviewed the evidence...concluded that the claimant did not have any listed impairment." But the DDS medical consultants don't know what they are talking about because they

> never examined the plaintiff, never considered sleep apnea, didn't know plaintiff's true weight or BMI and never considered impairments in combination. However, the DDS mental consultants *do* know what they are talking about because they assess "moderate limitations" *except* when they disagree with the ALJ's assessment of restrictions and limitations because the written rationales for these DDS mental consultants' opinions are "scant" and never consider the interplay of plaintiff's physical impairments on his mental functioning.

ECF No. 12 at 16 (emphases in original).

Plaintiff's counsel's gratuitous snarkiness is both out of line and harmful to his credibility. If his failed attempt to ridicule the ALJ was supposed to be funny, the Court assures him it was not. The ALJ's Step Three finding was based on independent consideration of all record evidence; he simply noted the agreement of State Agency reviewing consultants, like other medical sources, that Plaintiff's impairments were not of Listing-level severity. At Step Four, except for the impact of Plaintiff's obstructive sleep apnea on his functional activities (as discussed above), the ALJ sufficiently explained the RFC finding with citations to record evidence. The ALJ included in the RFC finding only those limitations opined by the reviewing consultants that were consistent with the ALJ's assessment of Plaintiff's RFC. The ALJ excluded the other limitations opined by the reviewing consultants because they were *less* restrictive than the ALJ's assessment. Put another way, the reviewing consultants opined that Plaintiff was able to perform *more* physical and mental work activities despite his impairments than the ALJ assessed. As Plaintiff's counsel well knows, that the ALJ did not share the reviewing consultants' opinion in this regard is – from his client's perspective – harmless error.

## V.    CONCLUSION

For these reasons, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case to the Commissioner for further proceedings in accordance with the preceding instructions.


Dated:   March 18, 2019                          _____s/ Paul A. Zoss_____
At Newark, New Jersey                     PAUL A. ZOSS, U.S.M.J.